UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO: 20-72977-PWB |
| | : | |
| REGINALD JAMES BARTHOLOMEW, | : | CHAPTER 13 |
|     Debtor | : | |
| | : | |
| | : | |
| | : | |

| | | |
|---|---|---|
| RUSHMORE LOAN MANAGEMENT SERVICES LLC | : | |
|     Movant | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD JAMES BARTHOLOMEW, | : | CONTESTED MATTER |
|     Debtor | : | |
| K. SAFIR SAFIR, | : | |
|     Trustee | : | |
| | : | |
|     Respondents. | : | |
| | : | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that Rushmore Loan Management Services LLC has filed a Motion for Relief from Stay and related papers with the Court seeking an order for Relief from Stay.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold an initial telephonic hearing for announcements on the Motion at the following number: (toll-free number: 833-568-8864; access code 161 794 3084 at **10:15 am** on **01/18/2023** in the **Courtroom 1401,** in the Richard B. Russell Federal Building and United States Courthouse, 75 Ted Turner Drive, SW, Atlanta GA 30303.

Matters that need to be heard further by the Court may be heard by telephone, by video conference, or in person, either on the date set forth above or on some other day, all

as determined by the Court in connection with this initial telephonic hearing. Please review the "Hearing Information" tab on the judge's webpage, which can be found under the "Dial-in and Virtual Bankruptcy Hearing Information" link at the top of the webpage for this Court, www.ganb.uscourts.gov for more information.

Your rights may be affected by the court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the court to grant the relief sought in these pleadings or if you want the court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk at least two business days before the hearing. The address of the Clerk's Office is Clerk, U.S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, Atlanta GA 30303.

If a hearing on the motion for relief from the automatic stay cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the motion and agrees to a hearing on the earliest possible date.  Movant consents to the automatic stay remaining in effect until the Court orders otherwise.

Dated: **December 22, 2022**        SIGNATURE  */s/ Ryan Starks*
Ryan Starks, GA Bar No. 676512
Travis Menk, GA Bar No. 632610
Attorney for Creditor
BROCK & SCOTT, PLLC
8757 Red Oak Boulevard, Suite 150
Charlotte, NC 28217
Telephone: (844) 856-6646
Facsimile: (704) 369-0760
E-Mail: GABKR@brockandscott.com

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

IN RE:
**REGINALD JAMES BARTHOLOMEW**
                    **DEBTOR**

**CASE NO.  20-72977-PWB
CHAPTER 13**

## CERTIFICATE OF SERVICE

This is to certify that I have on this day electronically filed the foregoing Motion For Relief From The Automatic Stay using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

CHRISTOPHER CAROUTHERS                K. EDWARD SAFIR
CHRIS CAROUTHERS & ASSOCIATES         STANDING CHAPTER 13 TRUSTEE
SUITE 131                             SUITE 1600
2250 NORTH DRUID HILLS RD.            285 PEACHTREE CENTER AVE. NE
ATLANTA, GA 30329                     ATLANTA, GA 30303

I further certify that on this day I caused a copy of this document to be served via United States first class mail, with adequate postage prepaid, on the following parties set forth below at the address shown for each:

REGINALD JAMES BARTHOLOMEW
1803 TREERIDGE PKWY
ALPHARETTA, GA 30022

Dated: **December 22, 2022**

*/s/Ryan Starks*
Ryan Starks, GA Bar No. 676512
Travis Menk, GA Bar No. 632610
Attorney for Creditor
BROCK & SCOTT, PLLC
8757 Red Oak Boulevard, Suite 150
Charlotte, NC 28217
Telephone: (844) 856-6646
Facsimile: (704) 369-0760
E-Mail: GABKR@brockandscott.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO: 20-72977-pwb |
| | : | |
| REGINALD JAMES BARTHOLOMEW, | : | CHAPTER 13 |
| Debtor | : | |
| | : | JUDGE BONAPFEL |
| | : | |
| | : | |

| | | |
|---|---|---|
| RUSHMORE LOAN MANAGEMENT | : | |
| SERVICES LLC | : | |
| Movant | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD JAMES BARTHOLOMEW, | : | CONTESTED MATTER |
| Debtor | : | |
| K. SAFIR SAFIR, | : | |
| Trustee | : | |
| | : | |
| Respondents. | : | |
| | : | |

**MOTION FOR RELIEF FROM AUTOMATIC STAY**

**COMES NOW** Rushmore Loan Management Services LLC (hereinafter "Movant"), a secured creditor in the above-captioned case, by and through counsel, Brock & Scott, PLLC, and moves this Court to enter an order granting its request for relief from the automatic stay imposed by 11 U.S.C. § 362(a):

1.     On December 26, 2020, the Debtor, Reginald James Bartholomew, filed a petition with the Bankruptcy Court for the Northern District of Georgia under Chapter 13 of Title 11 of the United States Code.

2.      Carroll Bartholomew and Dorothy L. Bartholomew hold title to the real property (hereinafter "Property") described in that Security Deed recorded in the Escambia County Clerk of Superior Court in Book 6466 at Page 1801 and recorded on June 2, 2009 (hereinafter "Security Deed") with an address of 800 Maple Woods Cir Pensacola, Florida 32534 aka 888 Maple Woods Cir, Pensacola, Florida 32534.  Carroll Bartholomew died on September 8, 2018, and Dorothy L. Bartholomew died on December 4, 2019.  A copy of the Mortgage is attached hereto and is incorporated herein as Exhibit "A".

3.      Movant holds a Promissory Note secured by the Security Deed from the Debtor in the original principal amount of $107,600.00 and dated May 28, 2009 (hereinafter "Note").  A copy of the Note is attached hereto and incorporated herein as Exhibit "B".

4.      The terms of the Note were amended by the attached loan modification agreement entered into effective December 1, 2009.  A copy of the loan modification is attached hereto and incorporated herein as Exhibit "C".

5.      Carroll Bartholomew died on September 8, 2018, and Dorothy L. Bartholomew died on December 4, 2019. Upon information and belief, the Debtor is an heir to Carroll and Dorothy Bartholomew and has an interest in the Property. As they died prior to the Debtor's bankruptcy being filed the Property is property of the debtor's bankruptcy estate.

6.      Upon information and belief, the current value of the Collateral is $204,791.00.  A copy of the Escambia County Property Appraiser is attached herein as Exhibit "D".

7.      Upon information and belief, the approximate payoff, exclusive of legal fees and expenses incurred in connection with the instant motion, due and owing to Movant as of November 17, 2022 is $114,962.95.

8.      In addition to the other amounts due to Movant reflected in this Motion, as of the

date hereof, in connection with seeking the relief requested in this Motion, Movant has also

incurred $1,050.00 in legal fees and $188.00 in costs. Movant reserves all rights to seek an award

or allowance of such fees and expenses in accordance with applicable loan documents and

related agreements, the Bankruptcy Code and otherwise applicable law.

9.      The mortgage payments are in default.  Upon information and belief, the amount

of default, exclusive of fees and costs, is as follows:

| 23 | Payments @ (01/01/2021 – 11/01/2022) | $760.36 | $17,488.28 |
|----|---------------------------------------|---------|------------|
|    | Suspense Balance | | ($0.00) |
|    | **Total Delinquency** | | **$17,488.28** |

10.     Cause exists for relief from the automatic stay as payments are not being made to

Movant.

11.     If the Debtor is experiencing a hardship such as job loss, income reduction, or

sickness due to COVID-19 and is no longer able to make mortgage payment, Debtor's counsel

may contact the undersigned counsel or contact the mortgage servicer directly

(www.rushmorelm.com) to discuss what mortgage payment relief options may be available to the

Debtor.  Options may include a temporary suspension of payments or similar alternative.  Not all

borrowers will qualify or be eligible for these options, but the servicer encourages the Debtor to

call and determine what the servicer can offer to assist the Debtor.

**WHEREFORE,** Movant prays the Court as follows:

1.      Modify the Automatic Stay of 11 U.S.C. § 362(a) to permit Movant to enforce its

security interest in the Collateral including but not limited to any non-bankruptcy remedies to

foreclose and obtain possession.

2. Modify Rule 4001(a)(3) of the Bankruptcy Code so that it is not applicable in this case and so Movant may immediately enforce and implement this order granting relief from the automatic stay.

3. As an alternative to the relief prayed for above, grant adequate protection to Movant for its interest in the Collateral.

4. That Creditor be entitled to recover its reasonable fees and expenses incurred in connection with seeking the relief requested in this Motion.

5. Movant specifically requests permission to communicate with the Debtor and Debtor's counsel to the extent necessary to comply with applicable non-bankruptcy law; and

6. Grant Movant such other and further relief as the Court deems just and proper.

Dated: **December 22, 2022**

*/s/Ryan Starks*
Ryan Starks, GA Bar No. 676512
Travis Menk, GA Bar No. 632610
Attorney for Creditor
BROCK & SCOTT, PLLC
8757 Red Oak Boulevard, Suite 150
Charlotte, NC 28217
Telephone: (844) 856-6646
Facsimile: (704) 369-0760
E-Mail: GABKR@brockandscott.com

Recorded in Public Records 06/02/2009 at 04:34 PM   OR Book 6466   Page 1801,
Instrument #2009039734, Ernie Lee Magaha Clerk of the Circuit Court Escambia
County, FL Recording $171.50   MTG Stamps $376.60 Int. Tax $215.20

Case 20-03974-pwb   Doc 49   Filed 12/21/22   Entered 12/21/22 01:24:15   Desc Main
Document   Page 8 of 49

After recording please return to:
SUNTRUST MORTGAGE, INC.
[Name]

[Attention]
**121 E.E. BUTLER PARKWAY**
[Street Address]
**GAINESVILLE, VA 30501**
[City, State  Zip Code]

This document prepared by:
**SUNTRUST MORTGAGE, INC.**
[Company Name]
**SUNTRUST MORTGAGE, INC.**
[Name of Natural Person]
**121 E.E. BUTLER PARKWAY**
[Street Address]
**GAINESVILLE, VA 30501**
[City, State  Zip Code]



*EXHIBIT A*

RECORD & RETURN TO:
WILSON, HARRELL, SMITH
& FARRINGTON, P.A.
307 SOUTH PALAFOX STREET
PENSACOLA FL 32502

FILE #▮▮▮▮▮▮▮▮

———————————————————[Space Above This Line For Recording Data]———————————————————

Loan No.: ▮▮▮▮▮▮

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**   **"Security Instrument"** means this document, which is dated **May 28, 2009**, together with all Riders to this document.

**(B)**   **"Borrower"** is **CARROLL BARTHOLOMEW, DOROTHY L BARTHOLOMEW, HUSBAND AND WIFE**. Borrower is the mortgagor under this Security Instrument.

**(C)**   **"Lender"** is **SUNTRUST MORTGAGE, INC.**. Lender is a **corporation** organized and existing under the laws of **THE COMMONWEALTH OF VIRGINIA**. Lender's address is **901 SEMMES AVENUE, RICHMOND, VA 23224**. Lender is the mortgagee under this Security Instrument.

**(D)**   **"Note"** means the promissory note signed by Borrower and dated **May 28, 2009**. The Note states that Borrower owes Lender **One Hundred Seven Thousand Six Hundred  and 00/100ths** Dollars (U.S. **$107,600.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **June 1, 2039**.

**(E)**    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F)**    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G)**    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Revocable Trust Rider
☐ Other(s) [specify]

**(H)**    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I)**    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J)**    **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)**    **"Escrow Items"** means those items that are described in Section 3.

**(L)**    **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)**    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)**    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)**    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

| **COUNTY** | of | **ESCAMBIA** |
|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

**SEE ATTACHED SCHEDULE A**

which currently has the address of **800 MAPLE WOODS CIR**
[Street]

**PENSACOLA**                    , Florida **32534**                    ("Property Address"):
[City]                                      [Zip Code]

Tax Parcel ID No.: █████████████

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of

its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's

equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has

released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if

Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

**(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)  Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value,

unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"):  (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Florida Mortgage–Single Family–Fannie Mae/Freddie Mac Uniform Instrument                      Form 3010 1/01
The Compliance Source, Inc.                      Page 10 of 14                      14001FL 04/02 Rev. 03/07
www.compliancesource.com                      ©2002, The Compliance Source, Inc.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental

protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BK:    6466    PG:    1813

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Witnesses:

_____

Williтом E. Farрington II
Printed, Typewritten, or Stamped Name

_____

_____
Printed, Typewritten, or Stamped Name

_____ (Seal)
CARROLL                                                    -Borrower
BARTHOLOMEW                    [Printed, Typewritten, or,
                                                        Stamped Name]
Post-Office Address: **1210N 7TH AVE, PENSACOLA,
FL 32503**

_____ (Seal)
DOROTHY L                                              -Borrower
BARTHOLOMEW                    [Printed, Typewritten, or,
                                                        Stamped Name]
Post-Office Address: **1210N 7TH AVE, PENSACOLA,
FL 32503**

_____ (Seal)
                                                            -Borrower
                                            [Printed, Typewritten, or,
                                                        Stamped Name]
Post-Office Address:

_____ (Seal)
                                                            -Borrower
                                            [Printed, Typewritten, or,
                                                        Stamped Name]
Post-Office Address:

BK:   6466   PG:   1814

## ACKNOWLEDGMENT

State of FLORIDA                          §
County of ESCAMBIA                        §
                                          §

The foregoing instrument was acknowledged before me on 5/28/09
by **CARROLL BARTHOLOMEW and DOROTHY L BARTHOLOMEW** who is personally known to me or
who has produced Drv License S , as identification.

_____
Signature of Person Taking Acknowledgment

William E. Farrington III
Name Type, Printed or Stamped

Notary Public - Florida
Title or Rank

Serial Number, if any: ████████

(Seal)

My Commission Expires: 11-1-10

Loan No. ███████

TO BE RECORDED WITH THE SECURITY INSTRUMENT

# RESIDENTIAL CONSTRUCTION RIDER

Words used in this Rider are defined below. Words in the singular mean and include the plural and vice versa.

"Borrower" is **CARROLL BARTHOLOMEW, DOROTHY L BARTHOLOMEW, HUSBAND AND WIFE**.
"Lender" is **SUNTRUST MORTGAGE, INC.**, and its successors or assigns.
"Note" means the promissory note in the original principal amount of **$107,600.00**, signed by Borrower in favor of Lender.
"Property" means the property commonly known as **800 MAPLE WOODS CIR, PENSACOLA, FL 32534**.
"Security Instrument" means the deed of trust/mortgage/security deed/security instrument signed by Borrower in favor of Lender, securing payment of the Note.

**THIS RESIDENTIAL CONSTRUCTION RIDER** shall be deemed to amend and supplement the Security Instrument of the same date given by Borrower to secure Borrower's Note to Lender of the same date and covering the Property described in the Security Instrument.

**AMENDED AND ADDITIONAL COVENANTS**. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1.  **Residential Construction Loan Agreement**. Borrower agrees to comply with the covenants and conditions of the Residential Construction Loan Agreement ("Loan Agreement") between Borrower, Lender and Contractor ("Contractor"), which is incorporated herein by this reference and made a part of this Security Instrument. The Loan Agreement provides for the construction of certain Improvements ("Improvements") on the Property. All advances made by Lender pursuant to the Loan Agreement shall be an indebtedness of Borrower secured by this Security Instrument as amended and such advances may be obligatory under the terms of the Loan Agreement. The Security Instrument secures the payment of all sums and the performance of all covenants, conditions and agreements required by the Lender in the Loan Agreement. Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Loan Agreement, the principal sum and all interest

---

and other charges provided for in the loan documents and secured hereby shall, at the option of the Lender, become due and payable.

2. **Construction Loan Security Instrument.** This Security Instrument is a "construction mortgage" securing an obligation incurred for the construction of Improvements on the Property including the acquisition cost of the Property, if any, and any notes issued in extension, renewal, or substitution thereof. Borrower affirms, acknowledges and warrants that prior to the recordation of this Security Instrument, as amended, in the Official Records of the county or the recording district where the Property is located, no Improvements contemplated by the Loan Agreement have been constructed, no work has been performed, and no materials have been ordered or delivered.

3. **Future Advances.** In addition to the sum evidenced by the Note, this Security Instrument shall secure all funds hereafter advanced by Lender to or for the benefit of Borrower, as contained in the contract and/or the Loan Agreement for the construction of Improvements on the mortgaged property or for any other purpose. All future advances shall be made within the time limit authorized by the laws of the state where the Property is located. To the extent that moneys advanced by Lender are used to pay for the costs of acquiring the Property, this mortgage shall be a purchase money security interest.

4. **Disbursements to Protect Security.** All sums disbursed by Lender prior to completion of the Improvements to protect the security of this Security Instrument, up to the principal amount of the Note and any future advances, shall be treated as disbursements pursuant to the Loan Agreement. All such sums shall bear interest from the date of disbursement at the rate stated in the Note, unless the collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law and shall be payable upon notice from Lender to Borrower requesting payment therefor.

5. **Assignment of Rights or Claims.** From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property.

6. **Breach by Borrower.** In case of breach by Borrower of the covenants and conditions of the Loan Agreement, Lender, at Lender's option, with or without entry upon the Property, (a) may invoke any of the rights or remedies provided in the Loan Agreement, (b) may accelerate the sums secured by this Security Instrument and invoke any of those remedies provided for in this Note, Security Instrument, or (c) may do both although failure to exercise any of its rights and remedies at any one time does not constitute a waiver or modification of any conditions, rights or remedies.

7. **Termination of Loan Agreement.** Upon completion of the Improvements (as determined by the Loan Agreement), the terms of the Loan Agreement shall be null and void, and there shall be no claim or defense arising out of or in connection with the Loan Agreement against the obligations of the Note and this Security Instrument.

8. **Property.** The property covered by this Security Instrument includes the Property described or referred to in this Security Instrument, together with the following, all of which are referred to as the "Property." The portion of the Property described below which constitutes real property is sometimes referred to as the "Real

Property." The portion of the Property which constitutes personal property is sometimes referred to as the "Personal Property," listed as follows:

Any and all buildings, improvements (provided in the Loan Agreement or otherwise), and tenements now or hereafter erected on the Property; any and all heretofore and hereafter vacated alleys and streets abutting the Property; easements, rights, appurtenances, rents (subject however to any assignment of rents to Lender), leases, royalties, mineral, oil and gas rights and profits; water, water rights and water stock appurtenant to the Property (to the extent they are included in Borrower's fee simple title); any and all fixtures, machinery, equipment, building materials, appliances, and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property and all replacements and accessions of them, including, but not limited to those for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air and light; security and access control apparatus; plumbing and plumbing fixtures; refrigerating, cooking and laundry equipment; carpet, floor coverings and interior and exterior window treatments; furniture and cabinets; interior and exterior sprinkler plant and lawn maintenance equipment; fire prevention and extinguishing apparatus and equipment, water tanks, swimming pool, compressor, vacuum cleaning system, disposal, dishwasher, range, and oven; any shrubbery and landscaping; any and all plans and specifications for development of or construction of Improvements upon the Property; any and all contracts and subcontracts relating to the Property; any and all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions related to the Property; any and all permits, licenses, franchises, certifications, and other rights and privileges obtained in connection with the Property; any and all products and proceeds arising from or by virtue of the sale, lease, or other disposition of any of the Property; any and all proceeds payable or to be payable under each policy of insurance relating to the Property; any and all proceeds arising from the taking of all or part of the Property for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof; all building permits, certificates of occupancy, and certificates of compliance; any right to use utilities of any kind including water, sewage, drainage and any other utility rights, however arising whether private or public, present or future, including any reservation, permit, letter, certificate, license, order, contract or otherwise and any other permit, letter, certificate, license, order, contract or other document or approval received from or issued by any governmental entity, quasi-governmental entity, common carrier, or public utility in any way relating to any part of the Property or the Improvements, fixtures and equipment thereon; all other interests of every kind and character which Borrower now has or at any time hereafter acquires in and to the Property, including all other items of property and rights described elsewhere in this Security Instrument.

9.   **Security Agreement and Financing Statement**.   This Security Instrument shall be a security agreement granting Lender a first and prior security interest in all of Borrower's right, title and interest in, to and under the Personal Property, under and within the meaning of applicable statutes of this state, as well as a mortgage or deed of trust granting a lien upon and against the Real Property.  In the event of any foreclosure sale all of the Real and Personal Property may, at the option of Lender, be sold as a whole or in any part.  It shall not be necessary to have present at the place of such sale the Personal Property or any part thereof.  Lender shall have all the rights, remedies and recourses with respect to the Personal Property afforded to a "Secured Party" by the applicable statutes

of this state in addition to and not in limitation of the other rights and recourse afforded Lender under this Security Instrument. Borrower shall, upon demand, pay to Lender the amount of any and all expenses, including the fees and disbursements of Lender's legal counsel and of any experts and agents which Lender may incur in connection with: (i) the making and/or administration of this Security Instrument; (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon any property, real and/or personal, described in this Security Instrument; (iii) the exercise or enforcement of any of the rights of Lender under this Security Instrument; (iv) the failure by Borrower to perform or observe any of the provisions or covenants in this Security Instrument; or (v) any actions taken by Lender for any reason whatsoever in any case or proceeding under Chapter 7, 11, or 13 of the Bankruptcy Code or any successor statute thereto, including, but not limited to, action taken with respect to issues particular to federal bankruptcy law.

Lender may, at its election, at any time after the delivery of this Security Instrument, sign one or more copies of this Security Instrument in order that such copies may be used as a financing statement under the statutes of the state where the Property is located. Lender's signature need not be acknowledged, and is not necessary to the effectiveness hereof as a mortgage, a security agreement, or (unless otherwise required by applicable law) a financing statement.

10. **Completion**. Lender shall not be responsible for the completion of the Improvements, and shall not in any way be considered a guarantor or surety of performance by Borrower or any Contractor or any sub-contractor. In the event the Improvements are not completed according to the plans and specifications approved by Lender, and it is determined for whatever reason the Lender does not have a lien arising by or through Borrower, then Lender shall have a valid lien for its loan amount, less the amount reasonably necessary to complete the Improvements, or in such event Lender, at its option, shall have the right to complete the Improvements, and the lien shall be valid for the loan amount.

11. **Invalid Provisions**. If any provision of this Security Instrument is declared invalid, illegal, or unenforceable by a court of competent jurisdiction, then such invalid, illegal or unenforceable provision shall be severed from this Security Instrument and the remainder enforced as if such invalid, illegal or unenforceable provision is not a part of this Security Instrument.

12. **Address.**

The name and address of Borrower during construction of the Improvements is:
**CARROLL BARTHOLOMEW and DOROTHY L BARTHOLOMEW**
**1210N 7TH AVE**
**PENSACOLA, FL 32503**

The name and address of Lender is:
**SUNTRUST MORTGAGE, INC.**
**901 SEMMES AVENUE**
**RICHMOND, VA 23224**

---

13.    **Termination of Rider.**   Upon completion of the Improvements (as determined by the Loan Agreement),  and so long as the Borrower is not in default under the provisions of the Loan Agreement, Security Instrument or the Note, the provisions and agreements contained in this Rider shall be terminated and will no longer have any force or effect.

14.    **IMPORTANT INFORMATION REGARDING THE CONSTRUCTION, REPAIR OR IMPROVEMENT TO YOUR PROPERTY.**

ANY PERSON PERFORMING LABOR ON YOUR PROPERTY OR FURNISHING MATERIALS FOR THE CONSTRUCTION, REPAIR, OR IMPROVEMENT OF YOUR PROPERTY MAY BE ENTITLED TO A LIEN AGAINST YOUR PROPERTY. THIS LIEN MAY BE ENFORCED BY THE SALE OF YOUR PROPERTY.  TO AVOID THIS RESULT, YOU MAY REQUEST FROM CONTRACTOR LIEN WAIVERS FROM ALL PERSONS PERFORMING LABOR OR FURNISHING MATERIALS FOR THE WORK ON YOUR PROPERTY.  YOU MAY BE ABLE TO WITHHOLD PAYMENT FROM CONTRACTOR IN THE AMOUNT OF ANY UNPAID CLAIMS FOR LABOR OR MATERIALS.  **SEEK THE ADVICE OF YOUR ATTORNEY.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Residential Construction Rider.

_____     _____
**CARROLL BARTHOLOMEW**    (Borrower)     **DOROTHY L BARTHOLOMEW**    (Borrower)

_____     _____
(Borrower)     (Borrower)

**ATTENTION OFFICIAL RECORDER OF INSTRUMENTS:**  This instrument covers goods that are or are to become fixtures on the described Property herein and is to be filed for record in the official records where mortgages on real estate are recorded.  Additionally, this instrument should be appropriately indexed, not only as a mortgage, but as a financing statement covering goods that are or are to become fixtures on the described Property herein.  The mailing address of the Borrower (Debtor) and Lender (Secured Party) are set forth in this instrument.

# Exhibit "A"

Lot 3, Block E of Maple Woods, according to the Plat thereof as recorded in Plat Book 11, Page 98, of the Public Records of Escambia County, Florida. Together with the West 25.00 feet of Lot 4, Block E, Maple Woods, as recorded in Plat Book 11, Page 98, of the public records of Escambia County, Florida, more particularly described as follows: begin at the Southwest corner of said Lot 3, thence North 01°45'28" East for 115.22 feet, thence South 88°15'17" East for 90.41 feet, thence South 01°45'28" West for 115.01 feet to the Northerly right of way line of Maple Woods Circle (60' R/W), thence North 88°23'10" West along said Northerly right of way line for 90.41 feet to the point of beginning.

File Number: ███████

Legal Description with Non Homestead

Ernie Lee Magaha
**CLERK OF THE CIRCUIT COURT**
**ESCAMBIA COUNTY FLORIDA**
INST# 2009077885 11/13/2009 at 03:49 PM
OFF REC BK: 6528 PG: 1426 - 1429 Doc Type: ASM
RECORDING: $35.50

After recording please return to:
**SUNTRUST MORTGAGE, INC.**
[Name]
**RVW 5093**
[Attention]
**1001 SEMMES AVENUE**
[Street Address]
**RICHMOND, VIRGINIA 23224**
[City, State Zip Code]

**This document prepared by:**
**SUNTRUST MORTGAGE, INC.**
[Company Name]
**SUNTRUST MORTGAGE, INC.**
[Name of Natural Person]
**121 E.E. BUTLER PARKWAY**
[Street Address]
**GAINESVILLE, VA 30501**
[City, State Zip Code]

Tax Parcel ID No.:

———————————————*[Space Above This Line For Recording Data]*———————————————

# FLORIDA ASSIGNMENT OF MORTGAGE

THE STATE OF FLORIDA

KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF **ESCAMBIA**

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is **901 SEMMES AVENUE, RICHMOND, VA 23224**, does hereby assigns, transfers and conveys, unto **Mortgage Electronic Registration Systems, Inc. ("MERS")**, its successors and assigns, P.O. Box 2026, Flint, MI 48501-2026, acting herein by and through its duly authorized officers, hereinafter called transferee, a Delaware Corporation, for and in consideration of **TEN AND NO/100 DOLLARS** CASH, AND OTHER GOOD AND VALUABLE CONSIDERATION, to it in hand paid by **SUNTRUST MORTGAGE, INC.**, hereinafter called transferor, the receipt of which is hereby acknowledged, has this day Sold, Conveyed, Transferred and Assigned and by these presents does hereby, Assign, Transfer and Convey, unto the said transferee hereinafter described indebtedness.

AND transferor further Grants, Sells and Conveys unto the transferee all the rights, title, interest and liens owned or held by transferor in the hereinafter described land by virtue of said indebtedness herein conveyed and assigned.

TO HAVE AND TO HOLD unto the said transferee, transferee's heirs and assigns the following described indebtedness together with all and singular the following mentioned lien and any and all liens, rights, equities, remedies, privileges, titles and interest in and to said land, which transferor has by virtue of being legal holder and owner of said indebtedness.

MERS TELEPHONE: 1-888-679-6377

SAID INDEBTEDNESS, LIENS AND LAND BEING DESCRIBED AS FOLLOWS:

One certain promissory note executed by **CARROLL BARTHOLOMEW, DOROTHY L BARTHOLOMEW, HUSBAND AND WIFE,** and payable to the order of **SUNTRUST MORTGAGE, INC.** in the sum of **One Hundred Seven Thousand Six Hundred and 00/100ths $107,600.00** dated **May 28, 2009** and bearing interest and due and payable in monthly installments as therein provided.

This transaction is only an assignment and transfer of the debt and the lien securing the debt. No new or additional indebtedness is involved in this transaction.

Said note being secured by Security Instrument of even date therewith to **SUNTRUST MORTGAGE, INC.,** Lender, which Mortgage is of record in Book, Volume, or Liber No. **6466,** at Page **1801-1820** (or as No. **2009036734**), of the Public Records of **ESCAMBIA** County, State of Florida, and secured by the liens therein expressed, on the following described lot, tract, or parcel of land, lying and being situated in **ESCAMBIA** County, Florida to wit:
**SEE ATTACHED SCHEDULE A**

EXECUTED without recourse on the undersigned to be effective on the **October 23, 2009** day of **23rd.**

Assignor:
SUNTRUST MORTGAGE, INC.

By: _____

Its: **RICHARD A. WILLITS, V.P.** _____

**ACKNOWLEDGMENT**

State of GA

County of Hall

§
§
§

The foregoing instrument was acknowledged before me this October 23, 2009
by **RICHARD A. WILLITS, V.P.**, as Vice President of **SUNTRUST MORTGAGE,
INC.**, a Virginia corporation, on behalf of the corporation. He/she is personally
known to me or who has produced _____ as identification.

G EISENBERG
Notary Public
Hall County
State of Georgia
My Commission Expires Aug 24, 2013

(Seal)

Signature of Person Taking Acknowledgment

G Eisenberg
Name Type, Printed or Stamped

NP
Title and Rank

Serial Number, if any:

My Commission Expires: Aug 24, 2013

# Exhibit "A"

Lot 3, Block E of Maple Woods, according to the Plat thereof as recorded in Plat Book 11, Page 98, of the Public Records of Escambia County, Florida. Together with the West 25.00 feet of Lot 4, Block E, Maple Woods, as recorded in Plat Book 11, Page 98, of the public records of Escambia County, Florida, more particularly described as follows: begin at the Southwest corner of said Lot 3, thence North 01°45'28" East for 115.22 feet, thence South 88°15'17" East for 90.41 feet, thence South 01°45'28" West for 115.01 feet to the Northerly right of way line of Maple Woods Circle (60' R/W), thence North 88°23'10" West along said Northerly right of way line for 90.41 feet to the point of beginning.

Legal Description with Non Homestead



**Loan No.** ▮▮▮▮▮▮▮▮

# NOTE

| **May 28, 2009** | **PENSACOLA** | **Florida** |
|---|---|---|
| [Date] | [City] | [State] |

**800 MAPLE WOODS CIR, PENSACOLA, FL 32534**
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ **107,600.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **SUNTRUST MORTGAGE, INC..** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.375 %.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.    PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **January, 2010**. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2039**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 79041, BALTIMORE, MD  21279--0041** or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ **675.09**.

**4.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the

Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.**   **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.**   **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.**   **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.**   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.      WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11.     DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HANDS AND SEALS OF THE UNDERSIGNED.

_____ (Seal)
CARROLL BARTHOLOMEW            -Borrower

_____ (Seal)
DOROTHY L BARTHOLOMEW        -Borrower

_____ (Seal)
                                          -Borrower

_____ (Seal)
                                          -Borrower

[Sign Original Only]

Without Recourse
PAY TO THE ORDER OF

SunTrust Mortgage Inc.

Deborah P. Ellis, Vice President

Loan No ▉▉▉▉▉▉▉

# RESIDENTIAL CONSTRUCTION LOAN
## ALLONGE TO NOTE
## (Multistate)

Words used in this Allonge are defined below.  Words in the singular mean and include the plural and vice versa.

"Borrower", "I", "Me", "My" is **CARROLL BARTHOLOMEW and DOROTHY L BARTHOLOMEW**.

"Construction Period" means the period beginning on the date of the Note and continuing until **November 16, 2009**.

"Loan Documents" mean the Note as amended by this Allonge, the Security Instrument as amended, the Commitment Letter (if applicable) and the Residential Construction Loan Agreement.

"Note" means the promissory note in the original principal amount of **$107,600.00**, signed by Me in favor of Note Holder.

"Note Holder is **SUNTRUST MORTGAGE, INC.**, and its successors or assigns.

"Maximum Rate" means the highest rate permitted by applicable state and/or federal law.

"Permanent Mortgage Date" is the date when the Construction Period ends and the Note and Security Instrument become a permanent mortgage loan.

"Residential Construction Loan Agreement" means the Residential Construction Loan Agreement between Note Holder and Me of even date herewith.

"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument signed by Me in favor of Note Holder, securing payment of the Note.

This Allonge is incorporated into and shall be deemed to amend and supplement the Note, of even date herewith, given by Me.  Notwithstanding anything to the contrary set forth in the Note, I hereby agree to the following:

**1.      CONSTRUCTION/PERMANENT LOAN**
The Note, as amended, represents both a construction/home improvement loan and a permanent mortgage loan.  During the Construction Period, Note Holder will advance funds in accordance with the Residential Construction Loan Agreement.

**2.      INTEREST AND PAYMENTS ·**
       **(A)      Interest During the Construction Period**
       The rate of interest shall be determined in accordance with the box checked below:

☐      During the Construction Period, I will pay interest only on the amount of principal advanced at the rate stated in the Note.

☒      During the Construction Period, I will pay interest only on the amount of principal advanced by Note Holder at an interest rate equal to the lesser of (a) the Prime Commercial Lending Rate established by **SUNTRUST**

---

Residential Construction Loan Allonge to Note (Multistate)
Proprietary W0211                                    Page 1 of 4                                    38760MU 11/05 Rev. 08/06

**BANK Plus One and 00/1000ths percent (1.000%)** (the "Applicable Rate"), or (b) the Maximum Rate. In the event that the Applicable Rate exceeds the Maximum Rate, the rate of interest shall be limited to the Maximum Rate. The Applicable Rate may change as often as every day in accordance with changes to the Prime Commercial Lending Rate.

**(B)      Interest Paid on the Permanent Loan**
Beginning on the Permanent Mortgage Date, interest shall accrue and monthly payments of principal and interest shall be due and payable as stated in the Note.

**(C)      Payments During Construction Period**
Payments due during the Construction Period, shall consist of interest only and shall be payable monthly in arrears beginning on the first day of the first month after principal is advanced, and on the first day of each successive calendar month thereafter. All interest accrued during the Construction Period shall be due and payable on the final day of the Construction Period.

**3.      NOTICE OF INTEREST RATE CHANGES DURING CONSTRUCTION PERIOD**
Unless required by applicable law, Note Holder will not provide Me with notice of interest rate changes during the Construction Period.

**4.      ADVANCES/COMPLETION**
Until the improvements are completed, any amount of principal not advanced prior to the end of the Construction Period may, in the sole discretion of Note Holder, be funded into an escrow account or a pledged account with Note Holder or its designated escrow agent, and advances may be made out of such escrow or pledged account. If Note Holder chooses to fund such an account, interest will accrue on advances when they are paid out of the account. Further, Note Holder may require either immediate payment of the Note (to the extent of funds advanced), or an extension of the Construction Period and a rescheduling of the Note, if deemed necessary for completion of the improvements securing the lien. Any portion of a payment received in excess of interest due, and any funds not advanced under the Residential Construction Loan Agreement may, at the option of Note Holder, be used to pay costs associated with the Construction Period or may be credited against the principal amount of the permanent loan.

**5.      LATE CHARGES**
Late charges will be assessed according to the terms set forth in the Note, except that during the Construction Period, any late charge will be calculated as a percentage of My overdue payment of interest only.

**6.      EVENTS OF DEFAULT AND ACCELERATION OF THE DEBT**
If any payment of interest is not made when due during the Construction Period or if default should occur under any covenant, condition or agreement contained in the Loan Documents, Note Holder may declare the entire unpaid principal balance and accrued interest due and payable under the terms of the Note as amended by this Allonge.

**7.      INTEREST RATE AND PRODUCT MODIFICATION OPTIONS**
Note Holder agrees to offer Me the options checked below:

☒      **(A)      Permanent Rate Cap and Float Down Option**
Notwithstanding the terms and provisions of the Note, I have a one-time option to lower the initial yearly interest rate set forth in the Note (the "Face Rate") if Note Holder's current "Market Rate" is lower than the Face Rate. Market Rate is defined as Note Holder's daily published rate. Market Rate is determined by several factors, and may be significantly higher than the Face Rate. Any such change shall be evidenced by a written modification agreement executed by Note Holder and Me. If applicable for the type of loan, such modification agreement shall also reflect the ratably adjusted annual and lifetime interest rate limitation. In order to be eligible to exercise this option, the following conditions must be met:

1. I must not be in default under any of the Loan Documents or the Note Holder's commitment letter (if any);
2. I must contact the Note Holder to secure a revised interest rate lock-in anytime within **10** days but no later than **3** business days prior to the Permanent Mortgage Date;
3. The loan must rollover to a permanent mortgage loan by the Permanent Mortgage Date;
4. I must sign any and all documents necessary to effect the modification; and
5. I must pay all fees necessary to effect the modification.

☐ **(B)    Permanent Product Modification**

Notwithstanding the terms and provisions of the Note, I have the option to modify the loan product set forth in the Note to another eligible product Note Holder offers at the time I give Note Holder notice of my intent to modify the loan product. Note Holder retains the right, in Note Holder's sole discretion, to determine the eligibility of products for this option to modify. Nothing contained herein is, or shall be deemed, a promise by Note Holder that any particular product will be eligible at the time I give Note Holder notice of my intent to modify the loan product. This option to modify can only occur on the Permanent Mortgage Date. In order to be eligible to exercise this option, the following additional conditions must be met:

1. I must not be in default under any of the Loan Documents or the Note Holder's commitment letter (if any);
2. I must contact the Note Holder to secure a revised interest rate lock-in anytime within 30 days but no later than           business days prior to the Permanent Mortgage Date;
3. I must qualify for the new loan product and provide updated documentation as required by Note Holder;
4. I must sign any and all documents necessary to effect the modification; and
5. I must pay all fees necessary to effect the modification.

If I choose to exercise the options to modify provided above, the interest rate and payment provisions will be set forth in a modification agreement between Note Holder and Me.

**8.    EXTENSION OF THE CONSTRUCTION PERIOD, FEES AND ADJUSTMENT OF INTEREST RATE**

**(A)    Extension of the Construction Period**

If the construction of the improvements and satisfaction of Borrower's obligations under the Loan Documents are not completed by the last day of the Construction Period, Note Holder may call the Note due or in Note Holder's sole discretion extend the Construction Period for a period of time as determined by Note Holder (the "Extended Construction Period"). I recognize that time is of the essence as to the length of the Construction Period. I confirm that the Construction Period establishes a reasonable time period to complete the improvements. I recognize that Note Holder will suffer financial loss if the improvements are not completed within the time specified.

**(B)    Fees for Extending the Construction Period**

If Note Holder elects to extend the Construction Period, I may be required to pay Note Holder an extension fee and any other fee associated with the extension of the Construction Period.

**(C)    Adjustment of Interest Rate**

If the construction of the improvements is not finished by the last day of the Construction Period, Note Holder could suffer financial loss. Such financial loss could come from the fact that the interest rate "locked" with Me was offered to Me based upon timely completion of the improvements. In addition to and not in lieu of or waiver or limitation of any other rights or remedies provided Note Holder, it is agreed that in the event the improvements are not finished by the last day of the Construction Period, the interest rate which I shall pay on the outstanding principal balance of the loan may be higher than the interest rate I "locked" with the Note Holder. The

new interest rate shall be equal to the greater of the rate stated in the Note or the rate established by Note Holder as its rate offered 3 business days prior to the last day of the Extended Construction Period. In determining the applicable interest rate, Note Holder may consider the entire secondary loan investment market, Note Holder's commitments with particular investors, and the principal amount and other terms, costs and conditions of the loan. Note Holder is under no obligation to mitigate its damages or to sell the loan for pricing less favorable than Note Holder's original pricing. I agree to execute and deliver to Note Holder, on a timely basis, a new promissory note showing the higher interest rate and such other documents as Note Holder may require.

**9.    CONFLICTS**

If any term or provision of this Allonge shall be in conflict with any term or provision of the Note, the term or provision of this Allonge shall control. This Allonge shall be interpreted under the laws of the state where construction takes place and under any applicable federal law. Any provisions of this Allonge adjudged to be invalid shall be deemed amended from it, with the remainder of the provisions to be in full force and effect. Any remedies or rights of Note Holder expressed in this Allonge are cumulative of, and not exclusive of any other remedies and rights. Except as amended or supplemented hereby, the terms and provisions of the Note shall remain unchanged and in full force and effect.

**10.    TERMINATION**

After the advance of all funds necessary to complete the improvements and the satisfaction of all conditions described in the Residential Construction Loan Agreement, this Allonge will be null and void and no longer in effect, and any funds remaining in any construction account will be refunded to Me or credited to the principal balance.

**11.    NOTICE OF NO ORAL AGREEMENT**

**THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

In acceptance and agreement to the terms and covenants contained in this Allonge, I have executed same on this **28th** day of **May, 2009**.

_____          _____
**CARROLL BARTHOLOMEW**        (Borrower)          **DOROTHY L BARTHOLOMEW**        (Borrower)

_____          _____
(Borrower)          (Borrower)

# PREPAYMENT FEE ADDENDUM TO NOTE
### Construction to Permanent Loan

Loan Number █████████

This Prepayment Fee Addendum To Note ("Addendum") is made this **28th** day of **May, 2009**, and is incorporated into and intended to form a part of the Note dated the same date as this Addendum and also amends and supplements the Residential Construction Loan Allonge to Note, mortgage, deed of trust, security deed, and/or security instrument (the "Security Instrument") dated the same date as this Addendum and the Note. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, Residential Construction Loan Allonge to Note, and/or the Security Instrument, the provisions of this Addendum shall prevail over and will supersede any inconsistent provisions of the Note, Residential Construction Loan Allonge to Note, and/or the Security Instrument.

The section of the Note entitled **Borrower's Right to Prepay** is amended to read in its entirety as follows:

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A Prepayment of only part of the principal is known as a "Partial Prepayment". A Prepayment of the full amount of the unpaid principal is known as a "Full Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**If I make a full Prepayment during the Construction Period prior to the Permanent Mortgage Date, then I agree to pay the Note Holder a Prepayment fee equal to one percent (1%) of the Note amount.** If the applicable Prepayment fee exceeds the maximum fee allowable by state or federal law then the maximum fee allowable by state or federal law will be applied. In no event will a Prepayment fee be assessed if such a fee violates applicable state or federal law.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_(signature)_____ (Seal)
**CARROLL BARTHOLOMEW** -Borrower

_(signature)_____ (Seal)
**DOROTHY L BARTHOLOMEW** -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*[Sign Original Only]*

**Loan No** ▮▮▮▮▮▮

# NAME AFFIDAVIT

Borrower(s): **CARROLL BARTHOLOMEW and
DOROTHY L BARTHOLOMEW**

Property: **800 MAPLE WOODS CIR,
PENSACOLA, FL 32534**

Words used in this Affidavit are defined below. Where the context requires, words in the singular mean and include the plural and vice versa.

**"Borrower"** is **CARROLL BARTHOLOMEW**
**"Lender"** is **SUNTRUST MORTGAGE, INC.**, and its successors or assigns.
**"Loan"** means the debt evidenced by the Note and all sums due under the Security Instrument.
**"Note"** means the promissory note(s) dated **May 28, 2009**, signed by Borrower in favor of Lender.
**"Security Instrument"** means the Deed of Trust/Mortgage/Security Deed/Security Instrument signed by Borrower in favor of Lender, securing payment of the Note.

BEFORE ME, the undersigned authority duly authorized to take acknowledgements and administer oaths, on this day personally appeared Borrower, who upon being duly sworn on oath stated the following:

1. I am the same person named in the Note and the Security Instrument.
2. I am one and the same person as:
   **CARROLL BARTHOLOMEW, CARROLL N BARTHOLOMEW;**
3. I also swear and affirm that the signature below is my true and exact signature for execution of the Loan documentation.
4. I understand that this Affidavit is given as a material inducement to cause Lender to make the Loan to me and that any false statements, misrepresentations or material omissions may result in civil and criminal penalties.

_Carroll Bartholomew_
CARROLL BARTHOLOMEW                    (Borrower)

Subscribed and sworn to before me on  5/28/09

_____
Notary Public in and for the State of **Florida**

(Seal)

*[Notary seal: WILLIAM E. FARRINGTON, NOTARY PUBLIC, STATE OF FLORIDA, My Comm Expires Nov. 1, 2010, No. DD0591182]*

Loan No.: ████████

# NAME AFFIDAVIT

Borrower(s): **CARROLL BARTHOLOMEW and DOROTHY L BARTHOLOMEW**

Property: **800 MAPLE WOODS CIR, PENSACOLA, FL 32534**

Words used in this Affidavit are defined below. Where the context requires, words in the singular mean and include the plural and vice versa.

**"Borrower"** is **DOROTHY L BARTHOLOMEW**
**"Lender"** is **SUNTRUST MORTGAGE, INC.**, and its successors or assigns.
**"Loan"** means the debt evidenced by the Note and all sums due under the Security Instrument.
**"Note"** means the promissory note(s) dated **May 28, 2009**, signed by Borrower in favor of Lender.
**"Security Instrument"** means the Deed of Trust/Mortgage/Security Deed/Security Instrument signed by Borrower in favor of Lender, securing payment of the Note.

BEFORE ME, the undersigned authority duly authorized to take acknowledgements and administer oaths, on this day personally appeared Borrower, who upon being duly sworn on oath stated the following:

1. I am the same person named in the Note and the Security Instrument.
2. I am one and the same person as:
   **DOROTHY L BARTHOLOMEW, DL BARTHOLOMEW**
3. I also swear and affirm that the signature below is my true and exact signature for execution of the Loan documentation.
4. I understand that this Affidavit is given as a material inducement to cause Lender to make the Loan to me and that any false statements, misrepresentations or material omissions may result in civil and criminal penalties.

_____
DOROTHY L BARTHOLOMEW                    (Borrower)

Subscribed and sworn to before me on   8/28/09

_____
Notary Public in and for the State of **Florida**

(Seal)

WILLIAM E. FARRINGTON, II
NOTARY
My Comm. Expires
Nov 1, 2010
No ████
PUBLIC
STATE OF FLORIDA

Ernie Lee Magaha
**CLERK OF THE CIRCUIT COURT**
**ESCAMBIA COUNTY FLORIDA**
INST# 2009077884 11/13/2009 at 03:49 PM
OFF REC BK: 6528 PG: 1420 - 1425 Doc Type: MOM
RECORDING: $52.50

Prepared by:
SUNTRUST MORTGAGE, INC. ,
121 E.E. BUTLER PARKWAY
GAINESVILLE, VA 30501
Return to:
RVW 5093
SUNTRUST MORTGAGE, INC.
1001 SEMMES AVENUE
RICHMOND, VIRGINIA 23224



*EXHIBIT C*

Parcel No.:

—————————[Space Above This Line For Recording Data]—————————

New Loan No: ▮▮▮▮▮▮▮▮

**"NO NEW MONIES"**          Orig Loan No:

# LOAN MODIFICATION AGREEMENT
### (Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 23rd day of **October, 2009**, between **CARROLL BARTHOLOMEW, DOROTHY L BARTHOLOMEW, HUSBAND AND WIFE** ("Borrower") and **SUNTRUST MORTGAGE, INC.** ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed, as amended or supplemented by any modification agreement prior to the date hereof (the "Security Instrument"), and Adjustable Rate Rider, if any, dated **May 28, 2009** and recorded in Book/Liber **6466**, at Page(s)/Folio(s) **1801-1820**, as Instrument No. **2009036734**, of the official Records of **ESCAMBIA COUNTY, Florida** [County and State, or other Jurisdiction] and (2) the Note, as amended or supplemented by any modification agreement prior to the date hereof, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at
**800 MAPLE WOODS CIR, PENSACOLA, FL 32534**
[Property Address]

the real property described being set forth as follows:
**SEE ATTACHED SCHEDULE A**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note and Security Instrument):

1.      As of **October 23, 2009**, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. **$107,600.00**, consisting of the amount(s) loaned to Borrower by Lender and any interest capitalized to date.

| | |
|---|---|
| **Tax Note.** (Intangibles, documentary stamp, or other) taxes in the amount of $      are being paid herein on new advances. Taxes were paid on the original loan dated and recorded as set out above, in the amount of $     . New advances are $ | |

*RECORDED AS RECEIVED*

2.   Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of **5.750%**, from **October 23, 2009**.

**Choose Fixed Rate or InterestFirst Fixed Rate Program by Checking the Correct Box**
☒ **Fixed Rate.** Borrower promises to make monthly payments of principal and interest of U.S. **$631.26** beginning on the **1st** day of **December, 2009**, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.

☐ **InterestFirst Fixed Rate.** Borrower will make monthly payments on the _____ day of each month beginning on _____. Borrower's payment will be in the amount of U.S. $_____ for the first _____ months from the date of this Agreement, and thereafter will be in the amount of U.S. $_____ until principal and interest are paid in full. The Lender will notify Borrower prior to the date of change in monthly payment.

3.   Borrower will make such payments at **SUNTRUST MORTGAGE, INC., P.O. BOX 79041, BALTIMORE, MD 21279--0041** or at such other place as Lender may require. If on **June 1, 2039** (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

4.   Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment". When Borrower makes a Prepayment, Borrower will tell the Lender in writing that Borrower is doing so. Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly payments due under the Note.

Borrower may make a full Prepayment or partial Prepayments without paying a Prepayment charge. Lender will use the Prepayments to reduce the amount of principal that Borrower owes under this Note. However, Lender may apply the Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying the Prepayment to reduce the principal amount of the Note. If Borrower makes a partial Prepayment, there will be no changes in the due date of the monthly payment unless Lender agrees in writing to those changes. However, under the InterestFirst Fixed Rate Program, if the partial Prepayment is made during the period when Borrower's payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when Borrower's payments consist only of interest as well as during the time the Borrower's payments consist of principal and interest. If the partial Prepayment is made under the Fixed Rate Program or during the period when Borrower's payments consist of principal and interest, the amount of Borrower's monthly payment will not decrease; however, the principal and interest required under this Agreement will be paid prior to the Maturity Date.

5.   If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument. However, this option will not be exercised by Lender if such exercise is prohibited by applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

6.    Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, and are replaced with the terms provided in this Agreement, as of the date of this Agreement:

    (a)    all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note;

    (b)    all terms and provisions of any adjustable rate rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above; and

    (c)    all terms and provisions of the Note and Security Instrument or other instrument or document that are affixed to, wholly or partially incorporated into, or are part of, the Note or Security Instrument (if any) providing for, implementing, or relating to any "interest only" or "Interest First" payment, the Borrower's right to prepay, or transfer of the Property or a beneficial interest in Borrower.

7.    Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.  Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

**RECORDED AS RECEIVED**

EXECUTED as of the day and year first written above.

_Carroll Bartholomew_    10/22/09    (Seal)
CARROLL BARTHOLOMEW    -Borrower

_Dorothy L Bartholomew_    10/22/09    (Seal)
DOROTHY L BARTHOLOMEW    -Borrower

_____ (Seal)
                 -Borrower

_____ (Seal)
                 -Borrower

## BORROWER

State of FL
County of Escambia    §

On this the 23rd day of October 2009, before me Eula F. Ruffin NP [here insert name and title of the officer], personally appeared Carroll Bartholomew & Dorothy L Bartholomew personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

RECORDED AS RECEIVED

_Eula F Ruffin_
Notary Signature

Notary
Title (or Rank)

_____
Serial/Notary Registration Number

NOTARY PUBLIC-STATE OF FLORIDA
Eula F Ruffin
Commission:
Expires: FEB. 13, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

My Commission Expires: 2/13/2013

(Seal)

C STATE OF FLORIDA
Eula F Ruffin
mission #DD848451
res: FEB. 13, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

ACCEPTED AND AGREED TO BY THE OWNER AND HOLDER OF SAID NOTE:
SUNTRUST MORTGAGE, INC.

By: _____

Title: **RICHARD A. WILLITS, V.P.**
_____

**LENDER**

State of GA
County of Hall                                        §
                                                     §

     On this the 23rd day of October 2009 , before me, G Eisenberg, NP
[here insert name and title of the officer], personally appeared **RICHARD A. WILLITS, V.P.**,
personally known to me (or proved to me on the basis of  satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.

     WITNESS my hand and official seal.

```
┌─────────────────────────────────┐
│     G EISENBERG                 │
│     Notary Public               │
│     Hall County                 │
│     State of Georgia            │
│ My Commission Expires Aug 24, 2013 │
└─────────────────────────────────┘
```

_____
Signature of Person Taking Acknowledgment

Notary Public
_____
Title (or Rank)

_____
Serial/Notary Registration Number

(Seal)                          My Commission Expires: Aug 24, 2013

**RECORDED AS RECEIVED**

---

## Exhibit "A"

Lot 3, Block E of Maple Woods, according to the Plat thereof as recorded in Plat Book 11, Page 98, of the Public Records of Escambia County, Florida. Together with the West 25.00 feet of Lot 4, Block E, Maple Woods, as recorded in Plat Book 11, Page 98, of the public records of Escambia County, Florida, more particularly described as follows: begin at the Southwest corner of said Lot 3, thence North 01°45'28" East for 115.22 feet, thence South 88°15'17" East for 90.41 feet, thence South 01°45'28" West for 115.01 feet to the Northerly right of way line of Maple Woods Circle (60' R/W), thence North 88°23'10" West along said Northerly right of way line for 90.41 feet to the point of beginning.

Legal Description with Non Homestead

Restore Full Version

EXHIBIT D



### General Information

| | |
|---|---|
| Owners: | BARTHOLOMEW DOROTHY L EST OF |
| Mail: | C/O PATRICK H BROWN |
| | 888 MAPLE WOODS CIR |
| | PENSACOLA, FL 32534 |
| Situs: | 888 MAPLE WOODS CIR 32534 |
| Use Code: | SINGLE FAMILY RESID |
| Taxing Authority: | COUNTY MSTU |
| Tax Inquiry: | Open Tax Inquiry Window |

Tax Inquiry link courtesy of Scott Lunsford
Escambia County Tax Collector

### Assessments

| Year | Land | Imprv | Total | Cap Val |
|---|---|---|---|---|
| 2022 | $11,000 | $193,791 | $204,791 | $176,820 |
| 2021 | $11,000 | $154,277 | $165,277 | $160,746 |
| 2020 | $11,000 | $135,133 | $146,133 | $146,133 |

Disclaimer

Market Value Breakdown Letter

Tax Estimator

File for New Homestead Exemption Online

### Sales Data

| Sale Date | Book | Page | Value | Type | Official Records (New Window) |
|---|---|---|---|---|---|
| 05/16/2022 | 8785 | 878 | $100 | OT | |
| 11/29/2018 | 8006 | 1501 | $100 | OT | |
| 11/1997 | 4191 | 174 | $13,300 | WD | |
| 11/1997 | 4191 | 172 | $7,000 | WD | |
| 11/1997 | 4191 | 170 | $7,000 | WD | |
| 01/1985 | 2024 | 830 | $165,000 | WD | |

Official Records Inquiry courtesy of Pam Childers
Escambia County Clerk of the Circuit Court and
Comptroller

### 2022 Certified Roll Exemptions

None

### Legal Description

LT 3 BLK E & W 25 FT OF LT 4 MAPLE WOODS S/D PB 11 P 98
OR 4191 P 174 OR 8006 P 1501 OR 8785 P 878

### Extra Features

None

### Parcel Information

| | |
|---|---|
| Section Map Id: | |
| Approx. Acreage: | 0.2501 |
| Zoned: | MDR |
| Evacuation & Flood Information | Open Report |



View Florida Department of Environmental Protection(DEP) Data



**Buildings**

Address:888 MAPLE WOODS CIR, Year Built: 2009, Effective Year: 2009, PA Building ID#: ▮▮▮

Structural Elements

**DECOR/MILLWORK**-*AVERAGE*
**DWELLING UNITS**-*1*
**EXTERIOR WALL**-*BRICK-FACE/VENEER*
**FLOOR COVER**-*TILE/STAIN CONC/BRICK*
**FOUNDATION**-*SLAB ON GRADE*
**HEAT/AIR**-*CENTRAL H/AC*
**INTERIOR WALL**-*DRYWALL-PLASTER*
**NO. PLUMBING FIXTURES**-*7*
**NO. STORIES**-*1*
**ROOF COVER**-*DIMEN/ARCH SHNG*
**ROOF FRAMING**-*HIP*
**STORY HEIGHT**-*0*
**STRUCTURAL FRAME**-*WOOD FRAME*

Areas - 2243 Total SF

**BASE AREA** - *1638*
**GARAGE FIN** - *460*
**OPEN PORCH FIN** - *45*
**PATIO** - *100*

Images

7/30/2019 12:00:00 AM

The primary use of the assessment data is for the preparation of the current year tax roll. No responsibility or liability is assumed for inaccuracies or errors.